REAVLEY, Circuit Judge,
concurring in part and dissenting in part:
I concur in the dismissal of charges against Fuhs because of the insufficiency *532 of the evidence at the stage of the end of the government’s case-in-chief. And I concur in affirming Brown’s convictions for perjury and obstruction of justice. I would, however, affirm the judgment against Brown, Bayly and Furst for conspiracy and wire fraud.
The government’s theory of wire fraud relating to the deprivation of honest services is warranted by 18 U.S.C. § 1346 because it applies to the behavior in this case. While the majority recognizes that the government provides a “very plausible, even strong case for a criminal deprivation of honest services,” it goes on to hold that the scheme as alleged in the indictment falls outside the scope of honest services fraud, and unnecessarily sets up a new “demilitarized zone” for the honest services fraud theory. (“[W]here an employer intentionally aligns the interests of the employee with a specified corporate goal, where the employee perceives his pursuit of that goal as mutually benefitting him and his employer, and where the employee’s conduct is consistent with that perception of mutual interest, such conduct is beyond the reach of the honest-services theory of fraud as it has hitherto been applied.”).
Both our pre- and post -McNally case law supports the honest services fraud theory alleged in the indictment and proven at trial. To prove a violation of the honest services branch of the federal fraud statutes, the government must prove that a defendant deprived his employer of services under state law. United States v. Caldwell, 302 F.3d 399, 409 (5th Cir.2002); United States v. Brumley, 116 F.3d 728, 734 (5th Cir.1997) (en banc) (the employee “must act or fail to act contrary to the requirements of his job under state law”). In United States v. Ballard, 663 F.2d 534, 535 (5th Cir.1981), this court held
that a breach of fiduciary duty of honesty or loyalty involving a violation of the duty to disclose could only result in criminal mail fraud where the information withheld from the employer was material and that, where the employer was in the private sector, information should be deemed material if the employee had reason to believe the information would lead a reasonable employer to change its business conduct.
See also United States v. Gray, 96 F.3d 769, 774-75 (5th Cir.1996) (same); United States v. Fagan, 821 F.2d 1002, 1009 (5th Cir.1987) (same). This court has held that “a breach of fiduciary duty can constitute illegal fraud ... only when there is some detriment to the employer.” Ballard, 663 F.2d at 540. The court went on to find that the detriment can be a deprivation of an employee’s faithful and honest services if a violation of the employee’s duty to disclose material information is involved. Id. Thus, this court has focused its inquiry on the duty to disclose and materiality.[1]
The indictment alleges that “[a]s Enron employees, Fastow, Glisan, [and] Boyle ... each owed a duty to Enron and its shareholders to provide the company with their honest services.” Count One then alleges that the defendants conspired to devise a scheme or artifice to defraud Enron and its shareholders “of the intangible right of honest services of its employees” *533 and that they used “materially false and fraudulent pretenses, representations, and promises” in the process. Counts Two and Three reiterate those allegations for the substantive wire fraud offenses.
The evidence at trial proved that Fas-tow, Glisan, Boyle, and McMahon, and other Enron personnel temporarily “parked” the barges with Merrill Lynch so that Enron could meet its earnings. The defendants never disputed that Fastow, Gli-san, Boyle, and McMahon were senior Enron executives and managers that owed a fiduciary obligations under state law to Enron and its shareholders. These fiduciary obligations included the duty of loyalty, fair dealing, and candor. The Enron executives and managers breached their fiduciary duties by “cooking” Enron’s books and engaging in the fraudulent “sale” of the barges to Merrill Lynch, withholding this information from Enron and its shareholders, and causing Enron to pay nearly $1.5 million to Merrill Lynch and LJM2 to hold the barges, along with paying compensation bonuses to APACHI executives that depended on the completion of the barge transaction.
In sum, the government proved that the defendants’ scheme involved withholding material information from Enron and its shareholders and caused a detriment to Enron and its shareholders. Given that our pre- and post-McNally case law supports the honest services fraud theory alleged in the indictment and proven at trial, this should end the matter.
To distinguish this case from previous cases, the majority relies on two important propositions: (1) that the barge transaction was intended to serve a corporate purpose/goal, (“This case, in which Enron employees breached a fiduciary duty in pursuit of what they understood to be a corporate goal, presents a situation in which the dishonest conduct is disassociated from bribery or self-dealing and indeed associated with and concomitant to the employer’s own immediate interest.”); and (2) that there could no honest services violation because certain Enron executives knew all of the specifics of the barge deal and sanctioned the transaction, (“Enron’s corporate incentive policy coupled with senior executive support for the deal (the deal was sanctioned by Fastow, Enron’s Chief Financial Officer), which together created an understanding that Enron has corporate interest in, and was a willing beneficiary of, the scheme.”). I object to both justifications for the conspiracy.
First, the barge transaction did not serve the purpose of Enron’s shareholders, and it cost Enron nearly $1.5 million, plus compensation to APACHI executives, that it should not have had to pay. Most important, falsifying Enron’s books does not serve a legitimate corporate purpose, even if it temporarily made Enron’s finances appear more attractive to the investing public in the short term. Second, it is no defense that the defendants’ co-conspirators included high-ranking executives at Enron. The fact that those co-conspirators were aware of defendants’ conduct does not excuse defendants’ actions. But most important, Enron executives are not Enron itself and, in any event, they owed a fiduciary duty to Enron and its shareholders.[2]
I conclude that the behavior of the defendants falls squarely within the meaning of a “scheme or artifice to deprive another of the intangible right to honest services,” measuring it against our pre- and post-McNally case law. I therefore respectfully dissent.

. I note that the Second Circuit in United States v. Rybicki, 354 F.3d 124, 145-46 (2d Cir.2003), a case involving a kickback scheme, followed the lead of this court and adopted the materiality test in lieu of the reasonably foreseeable harm test. The court found that private sector honest services cases fall into two general categories: bribery or kickbacks and self-dealing. Id. at 139. While certainly these type of cases fit comfortably into the plain meaning of § 1346, honest services fraud is not limited to those categories, and any implication otherwise is unjustified.

. For these two reasons, I find the majority’s attempt to distinguish and limit United States v. Gray, 96 F.3d 769 (5th Cir.1996), to be unpersuasive.